**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KOREAN AMERICAN BROADCASTING COMPANY, INC., KM COMMUNICATIONS, INC., and KM LPTV OF CHICAGO-28, LLC, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 09 C 6665 |
| KOREAN BROADCASTING SYSTEM and KBS AMERICA, INC., | ) ) ) | |
| Defendants. | ) | |

**<u>MEMORANDUM OPINION</u>**

Before the court is the motion of KBS America, Inc. to dismiss the First Amended Complaint.  For the following reasons, the motion is granted.

**<u>BACKGROUND</u>**

Korean American Broadcasting Company, Inc. ("KABC") and KM Communications, Inc. ("KM"), both Illinois corporations, and KM LPTV of Chicago-28, LLC ("Channel 28"), an Illinois limited liability company, brought this diversity action against Korean Broadcasting System ("KBS"), a South Korean corporation, and KBS America, Inc. ("KBS America"), a California corporation.

The following facts, taken as true for purposes of the instant motion, are drawn from the First Amended Complaint.  Plaintiffs

KABC and KM are affiliated with plaintiff Channel 28,[1] a Chicago-based television station that provides Korean-language broadcasting to about seven million households in the metropolitan area. Kun Chae Bae and Myoung Hwa Bae, a married couple, created Channel 28 in part to keep the Korean-American community apprised of current affairs in Korea and to help preserve the Korean language among emigrants to the United States.

Defendant KBS is a public television station and the largest of three major television networks in the Republic of Korea. In the early 1990s, plaintiffs formed a business relationship with KBS pursuant to which KBS agreed to provide Channel 28 with Korean-language programming from its network in exchange for payment by Channel 28. Channel 28 broadcast the television signal, KABC produced additional Korean-language content for the station, and KM invested capital and handled FCC licensure matters. During the first decade of their relationship, plaintiffs and KBS "essentially operated on a handshake basis." (First Am. Compl. ¶ 13.)

In July 2003, KBS launched an international television service, KBS World, which packaged news and entertainment programming for international distribution and broadcast. Channel 28 became KBS World's affiliate in Chicago and broadcast KBS World content almost exclusively. On July 16, 2004, KBS incorporated a

---

[1] Channel 28 currently broadcasts under the call sign WOCH-CA on channel 41 in Chicago.

wholly-owned subsidiary, defendant KBS America, to promote and expand KBS World through local Korean-language television providers in the United States. Prior to the incorporation of KBS America, plaintiffs had dealt directly with KBS. After the incorporation of KBS America, KBS informed plaintiffs that it would no longer be dealing with them directly, but through KBS America.

Between April and July 2004, Kevin Kwon, who was then the CEO of KBS America, contacted the Baes to discuss KBS America's plan for broadcasting KBS World programming in Illinois. Kwon also visited Chicago on numerous occasions to discuss KBS America's business plan with the Baes and their advisor, Yung Kim. During the negotiations, Kwon stated that KBS America's ultimate goal was to widely distribute KBS World programming throughout the United States, not just on terrestrial networks, but also on basic cable networks. (At the time, Channel 28 did not broadcast on any cable television networks.) It was very important to KBS America that KBS World programming would be aired on basic cable rather than as part of a premium cable package. "KBS America promised that its goal of achieving nationwide coverage for its station would dovetail with Plaintiffs' goal of distributing Korean language content as broadly as possible throughout Illinois, and therefore the parties would enjoy a long, fruitful, and mutually-beneficial relationship." (First Am. Compl. ¶ 24.) Because KBS promised plaintiffs that "a continued fruitful relationship would exist"

between plaintiffs and KBS's American subsidiary, plaintiffs agreed to do business with KBS America.  (First Am. Compl. ¶ 20.)

On July 20, 2005, Channel 28 entered into a contract with KBS America entitled "Broadcast License Agreement (Terrestrial)" (the "Agreement").  The Agreement, which had a three-year term, provided that KBS America granted Channel 28 a non-exclusive, non-transferable, and limited license to exhibit KBS World programming in the Chicago market on the terrestrial channel WOCH, in consideration for the payment of a $7,000 monthly fee.  Among other things, the Agreement also provided that Channel 28 would "make its best efforts to get digital basic cable carriage" in the local market, and that in the event Channel 28 obtained this cable carriage, it would "enter into a new broadcast license agreement with KBS America under terms substantially similar to those then being utilized by KBS America."  (First Am. Compl., Ex. A, Agreement, at 4.)

Plaintiffs allege that "repeatedly over the course of several years both before and after Plaintiffs began transmitting KBS World programming," Kwon represented that if plaintiffs could obtain basic cable carriage of KBS World content, "a long-term relationship between KBS America and Plaintiffs would then exist wherein neither the $7,000 monthly fee . . . nor any other fee would be paid to KBS America for KBS World programming."  (First Am. Compl. ¶ 27.)  In July 2005, in reliance on those

representations, plaintiffs decided to attempt to secure agreements with cable providers to retransmit Channel 28's broadcast or to otherwise broadcast KBS World content.

In July 2008, the Agreement expired by its own terms.  KBS America continued to provide its content to plaintiffs.  Plaintiffs continued their efforts to obtain basic cable carriage for Channel 28, and they were able to do so with AT&T U-Verse TV in August 2008 and with Comcast in July 2009.  Plaintiffs allege that then, "consistent with the parties' agreement, Channel 28 ceased paying the $7,000" monthly fee to KBS America.  (First Am. Compl. ¶ 32.) For several months, KBS continued to provide content to plaintiffs, but in 2009, KBS America demanded that Channel 28 pay a monthly license fee.  Plaintiffs contend that this demand was wrongful because it was a "direct and inexplicable contradiction to the many promises made by KBS and KBS America which had caused Plaintiffs to endeavor so seriously to obtain cable carriage on behalf of KBS and KBS America."  (First Am. Compl. ¶ 36.)  KBS America also took the position that AT&T was not a cable provider.

In September 2009, Kim, the Baes' advisor, met with KBS America's CEO, Chun Ai Choi.  According to plaintiffs, Choi "disavowed" KBS America's prior representations and stated that she was not bound by promises made by her predecessors.  Choi threatened to stop providing KBS World content to Channel 28 on

October 19, 2009 if Channel 28 did not pay license fees "retroactively and prospectively." (First Am. Compl. ¶ 38.)

In late September 2009, Jong Pil Chang, KBS America's Supervisor of the Strategic Planning Team, told plaintiffs that they would be required to pay a $20,000 monthly fee and a $240,000 security deposit to continue receiving KBS's content. Plaintiffs believe that the proposal was intended to sever the business relationship between them and KBS America. In addition, unbeknownst to plaintiffs, KBS World had been in contact with Comcast "to attempt to persuade Comcast to cease broadcasting Channel 28 and to begin licensing KBS America's content directly. Effectively, KBS World was seeking to squeeze out Plaintiffs, after Plaintiffs' hard work had resulted in striking a deal with Comcast, in order to obtain revenues which would have otherwise been split between Plaintiffs and KBS America." (First Am. Compl. ¶ 41.) It is alleged on information and belief that KBS America "has attempted a similar scheme" in other markets. (First Am. Compl. ¶ 43.)

KBS America terminated its transmission of KBS World programming to plaintiffs on October 22, 2009. Plaintiffs allege that in reliance on KBS and KBS America's representations, they forwent opportunities to lease Channel 28 for $100,000 per month and to sell Channel 28 for approximately $40,000,000. Also in reliance on defendants' representations, plaintiffs spent

$1,000,000 on a high-powered antenna, paid $3,000 per month for fiber-optic lines, hired and paid a staff of thirty to create programming to supplement KBS World content, and operated Channel 28 at a loss. Plaintiffs state that they lost "significant" advertising revenue as a result of the termination of their relationship with defendants. (First Am. Compl. ¶ 45(g).) In addition, "as a result of the loss of KBS World programming and KBS America's interference with Plaintiffs' relationship with Comcast, Comcast has indicated it intends to terminate its broadcast agreement with Plaintiffs." (First Am. Compl. ¶ 45(h).)

The First Amended Complaint contains nine counts: violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (Count I); common-law fraud (Count II); tortious interference with a business expectancy (Count III); tortious interference with a contract (Count IV); civil conspiracy (Count V); unjust enrichment, pled in the alternative (Count VI); negligent misrepresentation, pled in the alternative (Count VII); promissory estoppel (Count VIII); and violation of the Illinois Franchise Disclosure Act (Count IX). Plaintiffs seek compensatory damages in an amount exceeding $75,000, plus costs and reasonable attorney's fees. They also seek an injunction ordering defendants to cease all communication with Comcast in Chicago.

KBS America moves to dismiss the First Amended Complaint in its entirety.

## DISCUSSION

The purpose of a 12(b)(6) motion to dismiss is to test the sufficiency of the complaint, not to resolve the case on the merits. 5B Charles Alan Wright & Arthur R. Miller, <u>Federal Practice and Procedure</u> § 1356, at 354 (3d ed. 2004). Under federal notice-pleading standards, a complaint need not contain "detailed factual allegations," but it must have more than mere "labels and conclusions." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007). A plaintiff is obligated to provide the factual grounds of his entitlement to relief, and a "formulaic recitation" of the elements of a claim will not do. <u>Id.</u> The complaint must contain sufficient facts to raise a plaintiff's right to relief above a "speculative" level, <u>id.</u> at 555, and the claim must be "plausible on its face," <u>id.</u> at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Ashcroft v. Iqbal</u>, --- U.S. ----, ----, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). When evaluating a motion to dismiss a complaint, we must accept as true all factual allegations in the complaint, but not its legal conclusions. <u>Id.</u> at 1949-50.

## A. <u>Statutory Fraud (Count I)</u>

In Count I, plaintiffs allege that defendants engaged in deceptive and unfair business practices that violated the Illinois

Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq. (the "CFDBPA"). The specific practices alleged to have violated the CFDBPA are as follows:

> (a) KBS and KBS America induced Plaintiffs to enter into a business relationship for purposes of introducing, promoting and expanding KBS World in Illinois by and through Plaintiffs' facilities and resources and encouraged Plaintiffs[] to invest significant capital to upgrade the capabilities of Channel 28;
> (b) KBS and KBS America further induced Plaintiffs to invest considerable sums of money to obtain basic cable carriage with AT&T U-verse and Comcast in reliance upon the representation that a new, long-term agreement would be entered into between Plaintiffs and KBS America consistent with other license agreements then in place between KBS America and local stations who had obtained basic cable carriage;
> (c) Although KBS World is primarily broadcast by and through Plaintiffs' business relationship with cable television providers, KBS America held out to the public as if it has the direct relationship with the cable television providers;
> (d) KBS and KBS America induced Plaintiffs to invest considerable time and money to obtain basic cable carriage, only to have KBS America attempt to squeeze Plaintiffs out of the business arrangement with Comcast after such relationship had been established.

(First Am. Compl. ¶ 50.)

To state a claim under the CFDBPA, a plaintiff must plead a deceptive act or practice by the defendant; the defendant's intent that the plaintiff rely on the deception; and that the deception occurred during a course of conduct involving trade or commerce. Robinson v. Toyota Motor Credit Corp., 775 N.E.2d 951, 960 (Ill. 2002). Recovery may be had for unfair conduct as well. Id. "[W]here the dispute involves two businesses who are not consumers, the proper test is . . . whether the alleged conduct involves trade

practices addressed to the market generally or otherwise implicates consumer protection concerns." <u>Downers Grove Volkswagen, Inc. v. Wigglesworth Imports, Inc.</u>, 546 N.E.2d 33, 41 (Ill. App. Ct. 1989). KBS America argues that Count I must be dismissed because plaintiffs have failed to satisfy this "consumer nexus" test of the statute.

Plaintiffs were not acting as consumers of defendants' product, and they do not contend that defendants' alleged practices were addressed to the market generally. But they do contend that Count I implicates consumer-protection concerns because, "[w]hen KBS America wrongfully cut off its transmission of Korean-language content to Plaintiffs, it effectively cut off countless Korean immigrants from their connection to their homeland." (Pls.' Mem. in Opp'n to Def.'s Mot. at 9-10.) The argument is unavailing. First, there are no facts alleged in the complaint indicating that defendants' actions prevented any consumers from receiving Korean-language television. And even if there were, the loss of programming would not mean that consumers had been deceived or wronged. Second, the wrongful conduct alleged in Count I is not the termination of defendants' transmission of programming to plaintiffs. Because Count I fails to allege a consumer nexus, and we see no prospect of successful amendment in this regard, it will be dismissed with prejudice. We need not address KBS America's remaining arguments for dismissing Count I.

B.   **Common-Law Fraud (Count II) and**
     **Negligent Misrepresentation (Count VII)**

Count II is a common-law fraud claim in which plaintiffs allege that defendants, though Kwon, misrepresented that "once Plaintiffs obtained basic cable carriage, a new license agreement would be entered into between the parties wherein no license fee would be paid and the parties would profit through a split of the relevant advertising revenues to be gained, consistent with KBS America's agreements with other local stations who had successfully entered into retransmission agreements with cable providers." (First Am. Compl. ¶ 54.)   Defendants allegedly knew that this representation was untrue when made and intended to cut off programming to plaintiffs and deal directly with cable carriers once plaintiffs had established relationships with those carriers.

"To state a fraud claim under Illinois law, a plaintiff must allege that the defendant: (i) made a false statement of material fact; (ii) knew or believed the statement to be false; (iii) intended to and, in fact, did induce the plaintiff to reasonably rely and act on the statement; and (iv) caused injury to the plaintiff." Reger Dev., LLC v. National City Bank, 592 F.3d 759, 766 (7th Cir. 2010) (citing Redarowicz v. Ohlendorf, 441 N.E.2d 324, 331 (Ill. 1982)).[2]

---

[2]   KBS America cites both California and Illinois law in its brief, noting that "The License Agreement provides that California law governs. . . . Plaintiff appears to believe Illinois law governs." (Def.'s Mot. at 6.)   The License Agreement's choice-of-law provision, however, does not govern because plaintiffs have not brought a breach-of-contract claim; they bring tort claims. In a

KBS America seeks dismissal of Count II on several grounds. The first has to do with the Agreement's integration clause and its provision that in the event Channel 28 succeeded in obtaining cable carriage, it would enter into a new agreement with KBS America "under terms substantially similar to those then being utilized by KBS America." (Agreement at 4.) Defendant argues that this cable-carriage provision renders any reasonable reliance on an oral promise to waive the monthly fee "implausible" because it contradicts the alleged promise. In defendant's view, the integration clause "bolsters" that conclusion. (Reply at 4.)

A party cannot claim that it reasonably relied on precontractual representations if it could have discovered the fraud by reading the contract. See Regensburger v. China Adoption Consultants, Ltd., 138 F.3d 1201, 1207 (7th Cir. 1998) ("A party who could have discovered the fraud by reading the contract, and in fact had an opportunity to do so, cannot later be heard to complain that the contractual terms bind her."); Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc., 250 F.3d 570, 574-75 (7th Cir. 2001) ("As long as the complaining party could have discovered the fraud by reading the contract and had the opportunity to do so, Illinois courts have refused to extend the doctrine of fraudulent inducement

diversity suit, we apply the forum state's choice-of-law rules to determine the applicable substantive law. See Storie v. Randy's Auto Sales, LLC, 589 F.3d 873, 879 (7th Cir. 2009). Under Illinois conflicts principles, the law of the place of the injury presumptively governs in a tort suit. Speakers of Sport, Inc. v. Proserv, Inc., 178 F.3d 862, 864 (7th Cir. 1999). The place of the injury in this case is Illinois, because that is where plaintiffs are located. Thus, we will apply Illinois law.

to invalidate contracts"). But reliance on precontractual fraudulent statements is precluded as unreasonable only where a contract "flatly" contradicts them. <u>J.C. Whitney & Co. v. Renaissance Software Corp.</u>, No. 99 C 3714, 2000 WL 556610, at *10 (N.D. Ill. Apr. 19, 2000), <u>adopted in part on relevant grounds and modified in part on other grounds</u>, 98 F. Supp. 2d 981 (N.D. Ill. 2000).

The provision that Channel 28 would enter into a new agreement with KBS America "under terms substantially similar to those then being utilized by KBS America" after obtaining cable carriage could be viewed as somewhat inconsistent with a promise by KBS America to waive the monthly fee, but we cannot say as a matter of law that this ambiguous provision explicitly contradicts that promise, or in other words, that plaintiffs would have been able to discover the alleged fraud by reading the contract. Furthermore, an integration clause (as opposed to an anti-reliance clause, which the Agreement did not contain) does not bar a claim of fraud based on statements not contained in a contract. <u>See</u> <u>Vigortone AG Prods., Inc. v. PM AG Prods., Inc.</u>, 316 F.3d 641, 644-45 (7th Cir. 2002).

KBS America also contends that plaintiffs' fraud claim fails as a matter of law because KBS America performed its obligations under the Agreement and the complaint admits as much. The argument misses the mark for several reasons. The complaint does not include an admission that defendant performed all of its

obligations under the Agreement.  In addition, plaintiffs' claim is not for breach of contract; it is for fraud.  The promise alleged to have been broken was not contained in the Agreement.  Moreover, defendant cites no relevant Illinois case law that supports its argument.

Defendant fares better with its argument that plaintiffs' claim amounts to promissory fraud and that a scheme to defraud is not adequately alleged.  Promissory fraud, which involves a false statement of intent regarding future conduct, is not actionable under Illinois law unless the plaintiff alleges that the statement was part of a scheme to defraud.  <u>Association Benefit Servs., Inc. v. Caremark Rx, Inc.</u>, 493 F.3d 841, 853 (7th Cir. 2007).  "The scheme exception applies where a party makes a promise of performance, not intending to keep the promise but intending for another party to rely on it, and where the other party relies on it to his detriment."  <u>Bower v. Jones</u>, 978 F.2d 1004, 1011 (7th Cir. 1992) (internal quotation marks omitted).  On the distinction between a mere promissory fraud and a scheme of promissory fraud, the Seventh Circuit has observed:

> The distinction certainly is unsatisfactory, but it reflects an understandable ambivalence, albeit one shared by few other states, about allowing suits to be based on nothing more than an allegation of a fraudulent promise. There is a risk of turning every breach of contract suit into a fraud suit, of circumventing the limitation that the doctrine of consideration is supposed however ineptly to place on making all promises legally enforceable, and of thwarting the rule that denies the award of punitive damages for breach of contract. A great many promises

> belong to the realm of puffery, bragging, "mere words,"
> and casual bonhomie, rather than to that of serious
> commitment.  They are not intended to and ordinarily do
> not induce reliance; a healthy skepticism is a better
> protection against being fooled by them than the costly
> remedies of the law.  In any event it is not our proper
> role as a federal court in a diversity suit to read
> "scheme" out of Illinois law; we must give it some
> meaning.  Our best interpretation is that promissory
> fraud is actionable only if it either is particularly
> egregious or, what may amount to the same thing, it is
> embedded in a larger pattern of deceptions or enticements
> that reasonably induces reliance and against which the
> law ought to provide a remedy.

Desnick v. American Broad. Cos., 44 F.3d 1345, 1354 (7th Cir. 1995).

Because plaintiffs allege fraud, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) apply.  Rule 9(b) requires plaintiffs to plead with particularity the factual bases for averments of fraud, including "the identity of the person making the misrepresentation, the time, place, and content of the misrepresentation, and the method by which the misrepresentation was communicated to the plaintiff."  Hefferman v. Bass, 467 F.3d 596, 601 (7th Cir. 2006); see also DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990) (stating that plaintiff must plead the who, what, when, where, and how of the alleged fraud).

Plaintiffs fail to allege even a single misrepresentation with sufficient particularity, much less that it was embedded in a larger pattern of deceptions that satisfies the high burden on a plaintiff claiming promissory fraud.  Count II alleges that Kwon represented that once plaintiffs obtained basic cable carriage, the

parties would enter into a license agreement pursuant to which plaintiffs would not be required to pay a license fee, and the parties would split advertising revenues.  But this alleged misrepresentation is not alleged with sufficient particularity; stating that Kwon made it to "plaintiffs" without specifically identifying to whom it was made and where, and stating generally that it was made "repeatedly over the course of several years," First Am. Compl. ¶ 27, is insufficient.  Count VII, which alleges negligent misrepresentation, fails for the same reasons. (In fact, it is unclear which alleged misrepresentations Count VII is based upon.)

Because plaintiffs have failed to allege misrepresentations with particularity and have failed to allege a scheme to defraud, Counts II and VII will be dismissed.  The dismissals will be without prejudice; although it is doubtful that plaintiffs will be able to adequately state a fraud claim given that the current complaint falls far short, they will be given the opportunity to amend Counts II and VII.

**C.**   **Tortious Interference (Counts III and IV)**

In Counts III and IV, plaintiffs allege that they have both a contract with Comcast and a reasonable expectancy of continuing a business relationship with Comcast and that defendants knew of the contract and the expectancy.  Plaintiffs claim that defendants' efforts to persuade Comcast to stop doing business with plaintiffs

amounted to an intentional and unjustified interference with the contract and the expectancy.

KBS America asserts that Counts III and IV fail to state a claim because plaintiffs have not alleged that defendants engaged in any wrongful conduct. The argument is well-taken. "[O]ne may not simply sue any competitor who lures away customers . . . ." Chicago's Pizza, Inc. v. Chicago's Pizza Franchise Ltd. USA, 893 N.E.2d 981, 994 (Ill. App. Ct. 2008). To be actionable as tortious interference, "defendants' conduct must be wrongful, such as fraudulent, deceitful, intimidating, or deliberately disparaging." Hackman v. Dickerson Realtors, Inc., 520 F. Supp. 2d 954, 971 (N.D. Ill. 2007).

It is alleged merely that defendants attempted to compete with plaintiffs and begin dealing with Comcast directly. Plaintiffs contend in their response brief that their allegations concerning defendants' fraud are incorporated into their claims for tortious interference and "easily satisf[y]" the requirement of alleging independently wrongful conduct. (Pls.' Mem. at 10.) But there is no wrongful conduct alleged with regard to Comcast; the (inadequately pled) fraud has nothing to do with Comcast.[3]

KBS America also contends that Count III should be dismissed because plaintiffs have failed to adequately plead that their

---

[3] We reject, however, KBS America's argument that Counts III and IV should be dismissed because the Agreement permitted competition. It is not clear from the First Amended Complaint that the terms of the Agreement governed the relationship between KBS America and Channel 28 at all relevant times.

expectancy of future business with Comcast was reasonable. According to defendant, plaintiffs had "*no right* to promise KBS World-copyrighted material to Comcast--or to anyone else" and had no reasonable expectancy of access to the programming beyond the three-year term of the Agreement. (Def.'s Mot. at 14.) These "facts" are not apparent on the face of the complaint and are therefore beyond the scope of a motion to dismiss. But we do agree that <u>Twombly</u> and <u>Iqbal</u> require plaintiffs to set forth facts that render it plausible that they had a reasonable expectancy of a continuing business relationship with Comcast and that plaintiffs have failed to do so.

Plaintiffs concede that Count IV, the claim for tortious interference with a contract, should be dismissed for an additional reason: an element of the tort is the breach of a contract with plaintiffs, and it is not alleged that Comcast breached its contract with plaintiffs.

Counts III and IV will be dismissed. Because it is conceivable that plaintiffs could successfully amend these claims, the dismissal will be without prejudice.

**D.   <u>Civil Conspiracy (Count V)</u>**

Count V alleges that defendants conspired to defraud plaintiffs and to tortiously interfere with plaintiffs' contract with, and expectancy regarding, Comcast. Because the claims for

the underlying torts will be dismissed without prejudice, the claim for civil conspiracy will be dismissed without prejudice.

## E.   Unjust Enrichment (Count VI)

Count VI is an unjust enrichment claim, pled in the alternative, in which plaintiffs allege the following:

> 75.  Defendants have been enriched through the receipt of license fees, advertising revenues, and goodwill for KBS World programming.
>
> 76.  Plaintiffs have been impoverished through capital expenditures and the various previously-enumerated foregone business opportunities in reliance on the representations of Defendants.
>
> 77.  The enrichment of Plaintiffs [sic] is related to the impoverishment of Plaintiffs, as the enrichment of Plaintiffs [sic] would not have occurred absent the work performed by Plaintiffs and moneys expended by Plaintiffs.
>
> 78.  No justification exists for Defendants' wrongful acts in terminating its [sic] relationship with Plaintiffs.

(First Am. Compl. ¶¶ 75-78.)

To state an unjust enrichment claim under Illinois law, "a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience."  HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc., 545 N.E.2d 672, 679 (Ill. 1989). The key concept in regard to the instant complaint is that the retention of benefits must be *unjust*.  Absent a fiduciary relationship, which plaintiffs do not allege, a unjust enrichment

claim requires underlying wrongful conduct, such as fraud, duress, or undue influence.  See Pirelli Armstrong Tire Corp. v. Walgreen Co., No. 09 C 2046, 2010 WL 624709, at *8 (N.D. Ill. Feb. 18, 2010) (citing Illinois law).

It is unclear exactly what alleged conduct forms the basis for plaintiffs' unjust enrichment claim.  In paragraph 78, the "wrongful act" is alleged to be defendants' termination of the "relationship" with plaintiffs.  It is not explained, and we cannot discern, how that act was wrongful, or why it would constitute a "wrongful act" instead of a breach of contract (which is not alleged).  In their response brief, plaintiffs insist that the Agreement had expired and therefore that the "unjust enrichment" was outside the contract.  They seem to argue that they were not operating under any sort of contract with defendants at the time defendants terminated transmission of KBS World to plaintiffs, yet at the same time, they confusingly allege that the termination of the "relationship," whatever it was, was wrongful.  In paragraph 76, the "representations" of defendants are also mentioned.  But as discussed above, plaintiffs have not properly alleged any misrepresentations.

Because plaintiffs fail to adequately allege underlying wrongful conduct, their unjust enrichment claim will be dismissed without prejudice.

**F.    Promissory Estoppel (Count VIII)**

Count VIII is a claim for promissory estoppel. Promissory estoppel is a theory of recovery that provides a remedy "for those who rely to their detriment, under certain circumstances, on promises, despite the absence of any mutual agreement by the parties on all the essential terms of a contract." Newton Tractor Sales, Inc. v. Kubota Tractor Corp., 906 N.E.2d 520, 526 (Ill. 2009). To state a claim for promissory estoppel, plaintiff must allege (1) defendant made an unambiguous promise to plaintiff; (2) plaintiff relied on such promise; (3) plaintiff's reliance was expected and foreseeable by defendants; and (4) plaintiff relied on the promise to its detriment. Id. at 523-24.

It is alleged that "[d]efendants' promises to Plaintiffs of a continued business relationship in an effort to distribute Korean-language programming throughout Illinois and to enter into a new agreement substantially similar to KBS America's agreements with other stations airing on cable networks was unambiguous." (First Am. Compl. ¶ 85.) Plaintiffs claim that they relied on these promises by making significant capital investments, forgoing business opportunities, and spending considerable sums to obtain basic cable carriage of KBS World programming and that their reliance was expected, foreseeable; and detrimental. (First Am. Compl. ¶¶ 86-88.)

Count VIII fails to state an estoppel claim. Promissory estoppel is "meant for cases in which a promise, not being supported by consideration, would be unenforceable under conventional principles of contract law. When there is an express contract governing the relationship out of which the promise emerged, and no issue of consideration, there is no gap in the remedial system for promissory estoppel to fill. . . . Promissory estoppel is not a doctrine designed to give a party a second bite at the apple in the event it fails to prove a breach of contract." All-Tech Telecom, Inc. v. Amway Corp., 174 F.3d 862, 869-70 (7th Cir. 1999) (internal quotation marks omitted).

There was an express contract here governing the relationship out of which the alleged promises emerged. Plaintiffs' contention that the Agreement "has no bearing on cable television broadcast and cannot serve as a shield for KBS America in that arena," Pls.' Mem. at 14, is rejected. The Agreement specifically addresses what would happen in the event that plaintiffs obtained carriage of the programming on cable television, and, in fact, one of the promises that forms the basis for this claim, the promise "to enter into a new agreement substantially similar to KBS America's agreements with other stations," First Am. Compl. ¶ 85, actually appears in the Agreement. If plaintiffs are claiming that that promise was broken, then the appropriate action would be for breach of contract, not promissory estoppel. Where a valid contract exists

concerning the same subject matter, a plaintiff cannot use the theory of promissory estoppel to shift the risk that plaintiff knowingly assumed. <u>Wagner Excello Foods, Inc. v. Fearn Int'l, Inc.</u>, 601 N.E.2d 956, 964-65 (Ill. App. Ct. 1992).

As for the alleged promise "of a continued business relationship," First Am. Compl. ¶ 85, it does not satisfy the requirement of an unambiguous promise. The phrase is susceptible to multiple meanings and created no obligation. It cannot be the basis of a promissory estoppel claim.

Count VIII will be dismissed with prejudice because it appears that amendment would be futile.

## G. <u>Illinois Franchise Disclosure Act (Count IX)</u>

The Illinois Franchise Disclosure Act (the "Franchise Act"), 815 ILCS 705/26, provides a civil cause of action for damages caused by the termination of, or failure to renew, a franchise in violation of the statute. The Franchise Act states:

> Nonrenewal of a franchise. It shall be a violation of this Act for a franchisor to refuse to renew a franchise of a franchised business located in this State without compensating the franchisee either by repurchase or by other means for the diminution in the value of the franchised business caused by the expiration of the franchise where:
> . . .
> (b) the franchisee has not been sent notice of the franchisor's intent not to renew the franchise at least 6 months prior to the expiration date or any extension thereof of the franchise.

815 ILCS 705/20. Plaintiffs claim that defendants did not send notice of their intent not to renew plaintiffs' franchise at least

six months before its expiration date and that the termination of
their franchise resulted in a "drastic diminution" in Channel 28's
value.  (First Am. Compl. ¶ 98-99.)  Plaintiffs also allege:

> 92.  The agreements between KBS, KBS America and Channel
> 28, including but not limited to the expired written
> agreement . . ., granted Channel 28 the right to engage
> in the business of distributing KBS and KBS America's
> services under a system prescribed in substantial part by
> KBS and KBS America.

> 93.  The operation of Channel 28 was substantially
> associated with KBS and KBS America's intellectual
> property and commercial symbols designating the content
> as KBS'.

> 94.  The payments made by Channel 28 to KBS and KBS
> America constituted franchise fees in excess of $500.

> 95.  Accordingly, Channel 28 is a franchise of KBS and/or
> KBS America.

> 96.  KBS and KBS America refused to renew its [sic]
> franchise agreement with Channel 28.

(First Am. Compl. ¶¶ 92-96.)

KBS America maintains that Count IX should be dismissed for
two reasons: (1) plaintiffs did not operate a "franchise" within
the meaning of the Franchise Act; and (2) plaintiffs "admit" in the
complaint that they broadcast KBS World's programming on AT&T U-
Verse and thus that they breached the Agreement, and both the
Franchise Act and the Agreement gave KBS America the absolute right
to terminate the contract in the event of the other party's breach.
Both arguments are unpersuasive and would be more appropriately
asserted as affirmative defenses.  Plaintiffs do not admit in the
complaint that they broadcast KBS World programming on AT&T U-Verse

(only that they "obtained basic cable carriage"), much less that they breached the Agreement.  Moreover, the fact that the Agreement is not labeled as a franchise agreement is not dispositive, and the facts pleaded by plaintiffs do not demonstrate that a franchise did not exist or that plaintiffs did not pay a "franchise fee" within the meaning of the Franchise Act.

The claim, however, will be dismissed because plaintiffs have failed to adequately specify which agreement or agreements allegedly created a franchise.  The statute defines a "franchise" as an agreement, express or implied, oral or written, between two or more persons by which

> a) a franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services, under a marketing plan or system prescribed or suggested in substantial part by a franchisor; and
> (b) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and
> (c) the person granted the right to engage in such business is required to pay to the franchisor or an affiliate of the franchisor, directly or indirectly, a franchise fee of $500 or more . . . .

815 ILCS 705/3(1).  Count IX is based on the "agreements between KBS, KBS America, and Channel 28, including but not limited to the expired written agreement," and it is alleged that Channel 28 is a franchise of "KBS and/or KBS America."  (First Am. Compl. ¶¶ 92, 95.)  These allegations do not give defendants adequate notice of the claim.  If plaintiffs are alleging that there was some other

agreement in addition to the written Agreement that created a franchise, they should expressly allege that.

## CONCLUSION

For the foregoing reasons, defendant KBS America, Inc.'s motion to dismiss the First Amended Complaint [27] is granted. Counts I and VIII are dismissed with prejudice. Counts II, III, IV, V, VI, and VII, and IX are dismissed without prejudice, and plaintiffs may file a second amended complaint by August 27, 2010.

Defendants' motion in the alternative to dismiss the First Amended Complaint under Rule 12(b)(3) or to transfer venue [29] and the motion of defendant Korean Broadcasting System to dismiss the First Amended Complaint under Rule 12(b)(2) and the Foreign Sovereign Immunities Act of 1976 [28] are denied without prejudice to refiling.

A status hearing is set for September 9, 2010 at 1:00 p.m.

DATE:          August 4, 2010

ENTER:         _____

               John F. Grady, United States District Judge