**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KOREAN AMERICAN BROADCASTING COMPANY, INC., an Illinois Corporation, KM COMMUNICATIONS, INC., an Illinois Corporation, and KM LPTV OF CHICAGO-28, LLC, an Illinois limited liability company,<br><br>            Plaintiffs,<br><br>vs.<br><br>KOREAN BROADCASTING SYSTEM, a Corporation of the Republic of Korea, and KBS AMERICA, INC., a California Corporation,<br><br>            Defendants. | 1:09-cv-06665<br><br>Hon. John F. Grady |

## SECOND AMENDED COMPLAINT

NOW COME Plaintiffs Korean American Broadcasting Company, Inc., KM Communications, Inc. and KM LPTV of Chicago-28, LLC, by their attorney, Lee Law Offices, Ltd., and for their Complaint against Defendants Korean Broadcasting System and KBS America, Inc., states as follows:

### Parties

1.       At all times relevant hereto, Plaintiff KM Communications, Inc. ("KM") is an Illinois corporation with a principal place of business in Illinois.

2.       At all times relevant hereto, Plaintiff Korean American Broadcasting Corporation, Inc. ("KABC") is an Illinois corporation with a principal place of business in Illinois.

3.       At all times relevant hereto, Plaintiff KM LPTV of Chicago-28, LLC ("Channel 28") is an Illinois limited liability company with its principal place of business in Illinois.  The sole member of Channel 28 is Myoung Hwa Bae, an Illinois resident.

4.     At all times relevant hereto, Defendant Korean Broadcasting System ("KBS") is a corporation of the Republic of Korea that provides television programming, and is doing business in Illinois, on information and belief by and through its wholly owned subsidiary, KBS America, Inc.

5.     At all times relevant hereto, Defendant KBS America Inc. ("KBS America") is a California corporation and is, on information and belief, wholly owned by its parent company, KBS.  Plaintiffs are believed and allege that KBS America is the only authorized agent and distributor in the United States for and on behalf of KBS.

## Jurisdiction and Venue

6.     This Court has original subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  Complete diversity of citizenship existed as of the date of filing of this action in that the plaintiffs are Illinois entities with their principal places of business in Illinois; the defendant KBS is a corporation of the Republic of Korea with a principal place of business in the Republic of Korea; and the defendant KBS America is a California corporation with its principal place of business in California.

7.     The matter in controversy exceeds the sum or value of $75,000, exclusive of interest or costs.

## General Allegations

8.     KBS is a public television station and the largest of three major television networks in the Republic of Korea.

9.     Kun Chae Bae ("Mr. Bae") and Myung Haw Bae ("Mrs. Bae"), persons affiliated with Plaintiffs, are Korean immigrants to the United States.  The Baes are successful businesspeople who, over the course of decades have been involved in the ownership and

2

management of televisions stations. One of the reasons for this involvement was to obtain a medium to connect the Korean immigrant and Korean-American communities with television programming from Korea as a way both to keep these communities apprised of the goings-on in their ancestral country and as a way to help preserve the Korean language among those who had relocated to the United States.

10. To that end, the Baes, through investments in KM, expended significant capital and navigated the FCC licensure process in order to create a new television station, Channel 28.

11. Channel 28 was created to provide Korean-language television broadcasting in Illinois. It originally broadcast on channel 28 and is now broadcasting under the call sign of WOCH-CA on channel 41 in Chicago, Illinois. Channel 28 reaches approximately seven million households in the Chicago, Illinois metropolitan area.

12. In the early 1990s, Plaintiffs jointly formed a relationship with KBS wherein KBS agreed to provide Channel 28 with Korean-language programming from its network in exchange for payment by Channel 28. Channel 28 was the party which broadcast the television signal, while KABC produced certain additional Korean-language content for the channel, and KM invested moneys required and handled certain business with respect to station licensure.

13. In roughly the first decade of the broadcast relationship between KBS and Plaintiffs, Plaintiffs and KBS essentially operated on a handshake basis, trusting in the common purpose and mutual integrity of the parties involved.

14. On July 1, 2003, KBS launched an international television service, KBS World, which is Korean-language television programming distributed and broadcast around the world. For purposes of explanation, KBS World is similar in character to BBC America in that it is a package of news and fictional television programming from a foreign, publicly-owned television

network intended for international distribution.

15. Channel 28 became the KBS World "affiliate" of Chicago and broadcast almost exclusively KBS World content, in addition to six hours per week of local news and other Korean-American community oriented shows that are self-produced by one or more of the Plaintiffs including KABC. KBS World had other "U.S. affiliates" in New York, New Jersey, Atlanta, Seattle, San Francisco, Los Angeles, Washington DC, and Hawaii.

16. On July 16, 2004, KBS incorporated a wholly owned subsidiary, KBS America, for purposes of introducing, promoting, establishing and/or expanding KBS World by and through its local Korean-language television providers in the United States. For more than ten years prior to the incorporation of KBS America, Plaintiffs had dealt directly with KBS in Korea in obtaining Korean-language television content for retransmission in the United States, including KBS World content.

17. However, after incorporating KBS America, KBS informed Plaintiffs and other "affiliates" in New York, New Jersey, Atlanta, Seattle, San Francisco, Los Angeles, Washington DC, and Hawaii that KBS would begin dealing with its U.S. "affiliates" only through KBS America.

18. Most executives and senior managers of KBS America are employees of KBS in the division of KBS World and perform their duties in accord with directions and instructions from executives or senior officers of KBS in the Republic of Korea. The first CEO of KBS America was Oh Suk Mr. Kwon a/k/a Kevin Mr. Kwon ("Mr. Kwon"). The second CEO of KBS America was Moon Ki Eun ("Mr. Eun"). The current CEO of KBS America is Chun Ai Choi ("Ms. Choi").

19. Between April and July 2004, Mr. Kwon, the first CEO of KBS America,

contacted the Baes to discuss KBS America's business plan to broadcast KBS World programming in Illinois. At the initial meeting in April of 2004 with the Baes and Yung Kim ("Mr. Kim"), an advisor to Plaintiffs, Mr. Kwon stated, "KBS America's business goal is to distribute and broadcast KBS World's content through basic cable carriers. Once you get on one of those basic cable carriers, your monthly will be waived. KBS will take only a certain percentage of the profits from advertisements."

20. At the sequent meetings in May, June and July of 2004 with the Baes and Mr. Kim, Mr. Kwon made the foregoing statements. Mr. Kwon also said to them that it was of great importance that KBS World programming be aired on basic cable rather than as part of a premium cable package requiring an additional subscription over and above basic cable service. Mr. Kwon further said that the wide distribution of KBS World, being supported by the Korean government, would be of cultural service to Korean immigrants to the United States, and would further the political purposes of the Korean government by disseminating its desired messages to Korean Americans and U.S. citizens.

21. During the meetings between April and July of 2004, Mr. Kwon said to the Baes and Mr. Kim that KBS America wanted Plaintiffs to jointly be the procuring force which would obtain the broadcast of KBS World content on Illinois cable television carriers. Mr. Kwon promised that KBS America's goal of achieving nationwide coverage for its station would dovetail with Plaintiffs' goal of distributing Korean language content as broadly as possible throughout Illinois, and therefore the parties would enjoy a long, fruitful, and mutually-beneficial relationship.

22. Immediately following the last meeting in late July of 2004 with the Baes and Mr. Kim, Mr. Kwon sent a letter dated August 10, 2004 to Mr. Tony Rapoli, Manager, of Comcast

Chicago, a copy attached as Exhibit 1, stating:

> (1)    That KBS "recently established its new corporation in L.A. named 'KBS AMERICA, INC.' . . . which was designed to provide the region of North America with 24-hour KBS to programming";

> (2)    That "[a]s part of this valuable project, I would like to introduce Mr. Choi executive vice president of Korean-American Broadcasting Co., Ltd. in Chicago, as our negotiator to discuss the specifics of launching this channel"; and

> (3)    That "[w]hen this negotiation goes positive, I am sure that Comcast and KBS America will enjoy the success of business relationship."

23.    In reliance upon Mr. Kwon's representations made at the meetings between April and July of 2004 and the August 10, 2004 letter to Comcast, the Bases developed a relationship with KBS America at the insistence of KBS, because the Baes believed that providing Korean language programming in Illinois would be culturally beneficial to Korean immigrants and Americans of Korean descent and would help keep alive Korean language and traditions among those who had relocated to the United States.

24.    In reliance the promises of KBS and KBS America by and through Mr. Kwon that a continued fruitful relationship would exist with its American subsidiary and Plaintiffs will be waived to pay a monthly fee once they get on basic cable carriers, Plaintiffs agreed to do business with KBS's new entity and began to invest their assets for securing basic cable carriers.

25.    At no time between April of 2004 and December 16, 2007 did KBS and KBS America indicate to Plaintiffs that they consider only Comcast as the basic cable carrier for the purpose of being waived of the monthly fee.

26.     In late October of 2004, Mr. Kwon contacted the Baes and Mr. Kim, stating that although the business relationship between the parties is based on mutual trust and respect as common in Korean American business dealings, they still needed some sort of a written agreement to be assured of each other's commitment.   Accordingly, the parties executed an agreement in Korean dated January 20, 2005.  A copy of which is attached as Exhibit 2.  This one-year agreement with automatic renewal absent any notice was predated commencing on August 1, 2004 and expiring on December 31, 2005.

27.     In early July of 2005, Mr. Kwon informed the Baes and Mr. Kim that the parent company in Korea, KBS, were now asking all "affiliates" in the United States to execute a new agreement in English as prepared by their lawyers.  Mr. Bae and Mr. Kim objected that the new agreement did not reflect the parties' agreement that once Plaintiffs obtain basic cable channel, the $7,000.00 monthly fee be waived.

28.     In response, Mr. Kwon said to them that the "agreement" was only for formality to please the parent company, KBS, and the business relationship between the parties was still built upon mutual trust and respect.  Hence, Mr. Kwon assured them of his standing promise that once Plaintiffs get on basic cable channel, the monthly fee be waived.

29.     Upon Mr. Kwon's representation, Channel 28, the entity which was broadcasting the KBS World content, executed an agreement with KBS America, a copy of which is attached hereto as Exhibit 3.  Among other things, this agreement indicated Channel 28 would pay a $7,000 monthly fee to KBS America.  This agreement was limited solely to the terrestrial (non-cable/satellite) broadcast of KBS content.

30.     Mr. Kwon, then, requested Channel 28 to execute an addendum A to the Agreement, providing among other things that Channel 28 "has agreed to make every attempt to

gain must-carry cable carriage on all multiple channel operators within the DMA that are subject to FCC must-carry obligations" and if and when Channel 28 "does not fulfill [that obligation]," KBS America has "the right to terminate the Broadcasting License Agreement." A copy of which is attached as Exhibit 4.

31.     To assure the standing agreement between the parties, Mr. Kwon sent a letter dated September 23, 2005 to Mrs. Bae, a copy attached as Exhibit 5, stating:

> KBS America's mission is to get basic tier on the U.S. cable systems. In particular, Chicago as the third DMA in the U.S. market is one of the most important region for our goal.
>
> In this regard, it was tremendously exciting for us to hear from you that the number of Chicago audience who love KBS Drama are increasing since your stations began airing 'KBS World' last August.
>
> Comcast, as a major cable system operator in Chicago, we wish to provide them with our programming. If your station will be on Comcast as part of basic packages, we are willing to continue to provide you with our programming.

32.     In addition to the September 23, 2005 letter, Mr. Kwon sent another letter dated January 19, 2006 to Mrs. Bae, a copy attached as Exhibit 6, stating that "KBS America's mission is to get basic tier on the U.S. cable systems" and KBS and KBS World were "hoping that you will be able to secure a channel on the Comcast system within their basic programming package."

33.     At that time the written agreements (*see* Exhibits 3 and 4) were entered into, Channel 28 did not broadcast on any cable television networks, but rather only terrestrial television.

34.     On May 10, 2006, KBS America convened all the U.S. affiliates to discuss business plans and strategies in Atlanta, Georgia. Representatives of the U.S. affiliates from

New York, New Jersey, Seattle, Washington DC, and Hawaii, including Mr. Kim from Chicago, attended said meeting held at the office of the Atlanta affiliate.  One of the issues discussed at the meeting was how to get on basic cable carriers.  Mr. Kwon said to all the affiliates that once they get on basic cable channels, no monthly fee will be required and as one of the most crucial goals of KBS America's goals, the affiliates should do everything possible to get this done.

35.    Upon return from said meeting, Mr. Kim informed the Baes of Mr. Kwon's representation made at that meeting.  In reliance upon Mr. Kwon's representation, Plaintiffs had continued to invest their assets to get on basic cable channels.

36.    Once the written agreement (*see* Exhibits 3 and 4) expired on July 19, 2008, KBS America and Plaintiffs "orally" agreed to continue to distribute and broadcast KBS America' content in consideration of the $7,000.00 monthly fee, provided that once Plaintiffs obtain basic cable channel, that fee be waived.

37.    On August 12, 2008, Plaintiffs finally succeeded in obtaining cable carriage of Channel 28 with AT&T U-verse TV.

38.    However, the second CEO of KBS America, Mr. Eun, sent a letter dated December 17, 2008 to Mr. Bae, stating that Plaintiffs' distribution and broadcasting of KBS America' content without permission through "AT&T Cable" is a breach of the agreement and should be immediately stopped.  A copy of which is attached as Exhibit 7.

39.    In response to Mr. Eun's letter of December 17, 2008, Mr. Bae and Mr. Kim contacted Mr. Eun and asked him about the standing agreement between the parties concerning the monthly fee waiver.  Mr. Eun said to them that there had been a change of company policy directed by the parent company in Korea, and there was nothing he could do about it.

40.    Then, Mr. Jong Pil Chang, Supervisor of the Strategic Planning Team of KBS

America, sent a letter transmitted via facsimile on April 13, 2009 to Mr. Kim, stating that "as the extended broadcasting agreement will be expired on July 19, 2009, we must renew or terminate the agreement by June 19, 2009, one month before the expiration" and demanded all the monthly fees even after Plaintiffs obtained basic cable channel with AT&T. A copy of which is attached as Exhibit 8.

41.     In response to Mr. Eun's letter of December 17, 2008 and Mr. Chang's letter of April 13, 2009, Plaintiffs provided Eun with a statement from Marc D. Blakerman, Regional Vice President, External Affairs of AT&T, explaining about the operation of AT&T cable services in the state of Illinois. A copy of which transmitted on April 28, 2009 is attached as Exhibit 9.

42.     In response to Plaintiffs' letter of April 28, 2009, Mr. Eun sent a letter dated June 16, 2009 to Mr. Kim, stating that: (1) Plaintiffs' "are illegally broadcasting KBS World's content without permission by and through AT&T"; (2) AT&T is not a traditional cable provider, such as Comcast and Time Warner"; and (3) Plaintiffs "should submit a written statement from FCC or NCTA stating that "TV broadcasting service through AT&T [can] be regarded the same basic cable platform as existing Comcast, Time Warner or Cox." A copy of which is attached as Exhibit 10.

43.     KBS America, by and through its agents, Mr. Eun and Mr. Chang, disputed the nature of AT&T as a cable provider, declaring it instead to be a "phone company," as a thinly-veiled pretext to attempt to continue to collect the license fee.

44.     KBS America's demand of a license fee after Plaintiffs had succeeded in their efforts to obtain cable carriage was a direct and inexplicable contradiction to the many promises made by KBS and KBS America which had caused Plaintiffs to endeavor so seriously to obtain

cable carriage on behalf of KBS and KBS America.

45.     In or about early May of 2009, Ms. Choi from Korea became the third CEO of KBS America.  In an email transmitted on May 18, 2009 from Jay Jiyoung Noh ("Mr. Noh"), COO and CFO of KBS America to Vice President of KEMS TV, KBS America's affiliate in San Francisco, Mr. Noh stated that Ms. Choi was Director of KBS World Global Center which was directly above KBS America and implied that she now had her own business plan as a new CEO of KBS America.  In that email, Noh requested that in order to continue to distribute and broadcast KBS World's content, it was required to deposit $240,000 under the name of KBS America and a $20,000.00 monthly fee.  KEMS TV as one of KBS America's affiliates was also promised with the monthly fee waiver upon securing basic cable channel.

46.     In an interview with Economist published on September 25, 2005, Ms. Choi stated that "a success in business is determined by how much you can earn" and "ultimately, 'Show me the money!'"

47.     In July of 2009, Plaintiffs were able to obtain the initial agreement with Comcast. Comcast later announced that it will launch KBC-TV, a 24-hour Korean network for multi-generational Korean American and Asian American communities in the Chicago market, effective September 15, 2010.  Attached as Exhibit 11 is a copy of the Comcast & KBC-TV announcement dated September 7, 2010.

48.     KBS America's dishonesty became further apparent after Plaintiffs obtained basic cable carriage on Comcast.  Though not even a pre-textual argument could be made by KBS America that Comcast was not a cable company, as it had dishonestly attempted to argue with respect to AT&T, KBS America continued to assert it was entitled to a license fee, despite the fact the license agreement had expired and the parties had agreed that no future license fees

would be paid upon the procurement of basic cable carriage of Channel 28.

49.     In September 2009, Mr. Kim met with CEO of KBS America, Ms. Choi in her office to find a resolution.  During the meeting, Ms. Choi disavowed the standing agreement between the parties which, as stated above, had been repeatedly assured by Mr. Kwon and claimed she would not be bound by any promises made by her predecessors.  Ms. Choi threatened to cut off transmission of KBS World to Channel 28 effective October 19, 2009 if Channel 28 did not pay license fees retroactively and prospectively.  Her interview statement in September of 2005, "Show me the money!" was unequivocally expressed during this meeting.

50.     In late September 2009, Mr. Chang stated to Plaintiffs that Plaintiffs would be required to pay a $20,000.00 per month fee, in stark contrast to the prior $7,000 per month fee, and $240,000.00 for a security deposit if Plaintiffs wished to continue receiving KBS' content.

51.     The foregoing demand was consistent with the demand delivered by Mr. Noh to KEMS TV in San Francisco.  KBS America's demand for these egregious sums was in direct contravention of its representation that no fees would be required once basic cable carriage had been obtained, as it was in the mutual interest of both parties to obtain such carriage.

52.     This proposal was intended to sever the existing business relationship between Plaintiffs and KBS America and to discontinue transmission of KBS World to Channel 28.  KBS America successfully terminated its long-standing relationship with KEMS TV when it failed to satisfy the $240,000. 00 deposit and $20,000.00 monthly fee demands.

53.     Further, unbeknownst to Plaintiffs, KBS World had been in contact with Comcast to attempt to persuade Comcast to cease broadcasting Channel 28 and to begin licensing KBS America's content directly.  Effectively, KBS World was seeking to squeeze out Plaintiffs, after Plaintiffs' hard work had resulted in striking a deal with Comcast, in order to obtain revenues

which would have otherwise been split between Plaintiffs and KBS America.

54.     KBS America terminated transmission of KBS World to Plaintiffs at midnight on October 22, 2009.

55.     On information and belief, KBS America has attempted a similar scheme in which local television stations reach agreements with cable providers, essentially performing all the necessary hard work, only to then attempt to squeeze out the local television station from the deal with the cable carrier once basic cable carriage has been obtained.   On information and belief, Plaintiff has attempted such a scheme in the markets of San Francisco, San Diego, Hawaii, Atlanta and New Jersey.

56.     Plaintiffs expended significant sums of money in order to increase its area of distribution, obtain deals with local cable providers, and broadcast KBS' programming.

57.     The harms suffered by Plaintiffs in reliance on the representations of KBS and KBS America include:

(1)     Plaintiffs refused an offer to lease Channel 28 to a Spanish-language channel for payment of $100,000.00 per month.

(2)     In order to increase the coverage of the station to further increase the distribution of KBS World programming, Plaintiffs converted Channel 28's station to high power via installation of a high-powered antenna located on top of the John Hancock building in Chicago, Illinois at the approximate cost of $1,000,000.00.

(3)     Plaintiffs paid $3,000.00 per month for fiber optic lines to broadcast KBS programming at the John Hancock building in Chicago, Illinois.

(4)     Plaintiffs hired and paid a staff of approximately thirty persons to create

programming to supplement KBS World content.

(5)     Plaintiffs turned down an offer to sell Channel 28 for approximately $40,000,000.00 based upon the representations made by KBS regarding the future relationship between Plaintiffs and KBS.

(6)     Plaintiffs have continued to operate Channel 28 at a loss based on the representations made by KBS regarding the future relationship between Plaintiffs and KBS and anticipated profits to be earned upon the carriage of Channel 28 on basic cable networks.

(7)     Additionally, Plaintiffs have lost significant advertising revenue in an amount to be determined as a result of KBS and KBS America's wrongful decision to cease transmitting content to Plaintiffs.

(8)     Further, as a result of the loss of the KBS World programming and KBS America's interference with Plaintiffs' relationship with Comcast, Comcast has indicated it intends to terminate its broadcast agreement with Plaintiffs.

## **Count I: Violation of the Franchise Disclosure Act of 1987**

58.    Plaintiffs incorporate by reference, as though fully set forth herein, each and every preceding paragraph alleged above.

59.    At all times relevant hereto there was in existence in Illinois a statute known as the Franchise Disclosure Act of 1987, 815 ILCS 705/1 *et seq.* ("Franchise Disclosure Act").

60.    The Franchise Disclosure Act defines a franchise as follows:

"Franchise" means a contract or agreement, either expressed or implied, whether oral or written, between two or more persons by which:

(a) a franchisee is granted the right to engage in the business of offering, selling, or distributing goods or services, under a marketing plan or system prescribed or suggested in substantial part by a franchisor; and

(b) the operation of the franchisee's business pursuant to such plan or system is substantially associated with the franchisor's trademark, service mark, trade name, logotype, advertising, or other commercial symbol designating the franchisor or its affiliate; and

(c) the person granted the right to engage in such business is required to pay to the franchisor or an affiliate of the franchisor, directly or indirectly, a franchise fee of $500 or more;

815 ILCS 705/3-1 (West 2010)

61. There had been the agreements between KBS, KBS America and Channel 28, such as the first written agreement (*see* Exhibit 1), the written agreement attached (*see* Exhibits 3 and 4) and the oral agreement upon expiration of the written agreement. Such agreements granted Channel 28 the right to engage in the business of distributing KBS and KBS America's services under a system prescribed in substantial part by KBS and KBS America.

62. The operation of Channel 28 was substantially associated with KBS and KBS America's intellectual property and commercial symbols designating the content as KBS'.

63. The payments made by Channel 28 to KBS and KBS America constituted franchise fees in excess of $500.00.

64. Accordingly, Channel 28 is a franchise of KBS and/or KBS America.

65. KBS and KBS America refused to renew its franchise agreement with Channel 28.

66. The Franchise Disclosure Act states in part:

It shall be a violation of this Act for a franchisor to refuse to renew a franchise of a franchised business located in this State without compensating the franchisee either by repurchase or by other

> means for the diminution in the value of the franchised business caused by the expiration of the franchise where…
>
> (b) the franchisee has not been sent notice of the franchisor's intent not to renew the franchise at least 6 months prior to the expiration date or any extension thereof of the franchise.

815 ILCS 705/20 (West 2010)

67.     Neither KBS nor KBS America sent notice of their intent not to renew the franchise at least 6 months prior to the expiration date of the franchise.

68.     The termination of the franchise agreement resulted in a drastic diminution in the value of Channel 28.

**WHEREFORE**, Plaintiff Channel 28 prays that this Honorable Court enter judgment against Defendants in an amount exceeding $75,000.00, for reasonable attorney's fees and costs of lawsuit herein, and for such other and further relief as the Court may deem just and proper.

### Count II: Fraud

69.     Plaintiffs incorporate by reference, as though fully set forth herein, each and every preceding paragraph alleged above.

70.     Defendants, by and through their agent Mr. Kwon, represented that once Plaintiffs obtained basic cable carriage, a new license agreement would be entered into between the parties wherein no license fee would be paid and the parties would profit through a split of the relevant advertising revenues to be gained, consistent with KBS America's agreements with other local stations who had successfully entered into retransmission agreements with cable providers as follows:

> (1)     At the initial meeting in April of 2004 with the Baes and Mr. Kim, Mr. Kwon said to them that "KBS America's business goal is to distribute and broadcast KBS World's content through basic cable carriers.  Once you

get on one of those basic cable carriers, your monthly will be waived. KBS will take only a certain percentage of the profits from advertisements."

(2)    At the meetings in May, June and July of 2004 with the Baes and Mr. Kim, Mr. Kwon said to them that it was of great importance that KBS World programming be aired on basic cable rather than as part of a premium cable package requiring an additional subscription over and above basic cable service.

(3)    During the meetings between April and July of 2004, Mr. Kwon said to the Baes and Mr. Kim that KBS America wanted Plaintiffs to jointly be the procuring force which would obtain the broadcast of KBS World content on Illinois cable television carriers.

(4)    During the meetings between April and July of 21004, Mr. Kwon said to the Baes and Mr. Kim that KBS America's goal of achieving nationwide coverage for its station would dovetail with Plaintiffs' goal of distributing Korean language content as broadly as possible throughout Illinois, and therefore the parties would enjoy a long, fruitful, and mutually-beneficial relationship.

(5)    To facilitate Plaintiffs' access to basic cable carriage, Mr. Kwon sent a letter dated August 10, 2004 to Mr. Tony Rapoli, Manager, of Comcast Chicago, thereby having introduced Executive Vice President of KABC as KBS America's negotiator.

(6)    KBS America made Plaintiffs to execute the addendum A to the

17

Agreement (*see* Exhibit 4) to make sure that Channel 28 "has agreed to make every attempt to gain must-carry cable carriage on all multiple channel operators within the DMA that are subject to FCC must-carry obligations" and if and when Channel 28 "does not fulfill [that obligation]," KBS America has "the right to terminate the Broadcasting License Agreement."

(7)    To assure the standing agreement between the parties, Mr. Kwon sent the September 23, 2005 letter to Mrs. Bae.

(8)    To assure the standing agreement between the parties, Mr. Kwon sent the September 23, 2005 letter to Mrs. Bae.

(9)    At the May 10, 2006 meeting of KBS America's affiliates, Mr. Kwon said to their representatives that once they get on basic cable channels, no monthly fee will be required and as one of the most crucial goals of KBS America's goals, the affiliates should do everything possible to get this done.

71.    The aforementioned statements were made to induce Plaintiffs to venture to obtain basic cable carriage for Channel 28, and therefore, the programming of KBS World.

72.    Defendants knew that those representations were untrue at the time such representations were made. Defendants intended to exploit the relationships developed by Plaintiffs with cable companies by squeezing Plaintiffs out of such relationships after they had been established.

73.    Defendants knew that once Plaintiffs had established relationships with basic cable carriers, they would cut off programming to Plaintiffs and seek to make deals directly with

the cable providers for the KBS World programming.

74. In reliance upon the aforementioned statements, Plaintiffs had developed a relationship with KBS America and invested their assets for obtaining basic cable carriers.

75. At no time between April of 2004 and December 16, 2007 did KBS and KBS America indicate to Plaintiffs that they consider only Comcast as the basic cable carrier for the purpose of being waived of the monthly fee.

76. Plaintiffs relied upon the aforementioned representations to their detriment in that Plaintiffs invested considerable time and money to obtain basic cable carriage and in lost revenues stemming from the termination of the KBS World programming, and have suffered damages as a result.

**WHEREFORE**, Plaintiffs pray that this Honorable Court enter judgment against Defendants in an amount exceeding $75,000.00, costs of lawsuit herein, and for such other and further relief as the Court may deem just and proper.

### Count III: Negligent Misrepresentation
### (Pled in the Alternative)

77. Plaintiffs incorporate by reference, as though fully set forth herein, each and every preceding paragraph alleged above.

78. Defendants, by and through their agent Mr. Kwon, represented that once Plaintiffs obtained basic cable carriage, a new license agreement would be entered into between the parties wherein no license fee would be paid and the parties would profit through a split of the relevant advertising revenues to be gained, consistent with KBS America's agreements with other local stations who had successfully entered into retransmission agreements with cable providers as follows:

(1) At the initial meeting in April of 2004 with the Baes and Mr. Kim, Mr.

Kwon said to them that "KBS America's business goal is to distribute and broadcast KBS World's content through basic cable carriers. Once you get on one of those basic cable carriers, your monthly will be waived. KBS will take only a certain percentage of the profits from advertisements."

(2) At the meetings in May, June and July of 2004 with the Baes and Mr. Kim, Mr. Kwon said to them that it was of great importance that KBS World programming be aired on basic cable rather than as part of a premium cable package requiring an additional subscription over and above basic cable service.

(3) During the meetings between April and July of 2004, Mr. Kwon said to the Baes and Mr. Kim that KBS America wanted Plaintiffs to jointly be the procuring force which would obtain the broadcast of KBS World content on Illinois cable television carriers.

(4) During the meetings between April and July of 21004, Mr. Kwon said to the Baes and Mr. Kim that KBS America's goal of achieving nationwide coverage for its station would dovetail with Plaintiffs' goal of distributing Korean language content as broadly as possible throughout Illinois, and therefore the parties would enjoy a long, fruitful, and mutually-beneficial relationship.

(5) To facilitate Plaintiffs' access to basic cable carriage, Mr. Kwon sent a letter dated August 10, 2004 to Mr. Tony Rapoli, Manager, of Comcast Chicago, thereby having introduced Executive Vice President of KABC as

20

KBS America's negotiator.

(6)    KBS America made Plaintiffs to execute the addendum A to the Agreement (*see* Exhibit 4) to make sure that Channel 28 "has agreed to make every attempt to gain must-carry cable carriage on all multiple channel operators within the DMA that are subject to FCC must-carry obligations" and if and when Channel 28 "does not fulfill [that obligation]," KBS America has "the right to terminate the Broadcasting License Agreement."

(7)    To assure the standing agreement between the parties, Mr. Kwon sent the September 23, 2005 letter to Mrs. Bae.

(8)    To assure the standing agreement between the parties, Mr. Kwon sent the September 23, 2005 letter to Mrs. Bae.

(9)    At the May 10, 2006 meeting of KBS America's affiliates, Mr. Kwon said to their representatives that once they get on basic cable channels, no monthly fee will be required and as one of the most crucial goals of KBS America's goals, the affiliates should do everything possible to get this done.

79.    Defendants were careless or negligent in ascertaining the truth of its statements with respect to its relationship with Plaintiffs.

80.    Defendants owed Plaintiffs a duty to communicate accurate information with respect to their business dealings.

81.    Plaintiffs relied upon said representations to its detriment in that Plaintiffs invested considerable time and money to obtain basic cable carriage and in lost revenues

stemming from the termination of the KBS World programming.

**WHEREFORE**, Plaintiffs pray that this Honorable Court enter judgment against Defendants in an amount exceeding $75,000.00, costs of lawsuit herein, and for such other and further relief as the Court may deem just and proper.

## Count IV: Conspiracy

82.     Plaintiffs incorporate by reference, as though fully set forth herein, each and every preceding paragraph alleged above.

83.     An agreement existed between KBS and KBS America to misrepresent Defendants' business plans in order to induce Plaintiffs to establish a relationship with Comcast to enable Defendants to attempt to exploit that relationship by interfering with Plaintiffs' existing contract with Comcast and future business expectations.

84.     For purposes of inducing Plaintiffs to enter into business relationship with Defendants and invest their assets to establish and increase Defendants' market value, Mr. Kwon made the following representations to Plaintiffs and other affiliates:

(1)     At the initial meeting in April of 2004 with the Baes and Mr. Kim, Mr. Kwon said to them that "KBS America's business goal is to distribute and broadcast KBS World's content through basic cable carriers. Once you get on one of those basic cable carriers, your monthly will be waived. KBS will take only a certain percentage of the profits from advertisements."

(2)     At the meetings in May, June and July of 2004 with the Baes and Mr. Kim, Mr. Kwon said to them that it was of great importance that KBS World programming be aired on basic cable rather than as part of a premium

cable package requiring an additional subscription over and above basic cable service.

(3)     During the meetings between April and July of 2004, Mr. Kwon said to the Baes and Mr. Kim that KBS America wanted Plaintiffs to jointly be the procuring force which would obtain the broadcast of KBS World content on Illinois cable television carriers.

(4)     During the meetings between April and July of 21004, Mr. Kwon said to the Baes and Mr. Kim that KBS America's goal of achieving nationwide coverage for its station would dovetail with Plaintiffs' goal of distributing Korean language content as broadly as possible throughout Illinois, and therefore the parties would enjoy a long, fruitful, and mutually-beneficial relationship.

(5)     To facilitate Plaintiffs' access to basic cable carriage, Mr. Kwon sent a letter dated August 10, 2004 to Mr. Tony Rapoli, Manager, of Comcast Chicago, thereby having introduced Executive Vice President of KABC as KBS America's negotiator.

(6)     Mr. Kwon made Plaintiffs to execute the addendum A to the Agreement (*see* Exhibit 4) to make sure that Channel 28 "has agreed to make every attempt to gain must-carry cable carriage on all multiple channel operators within the DMA that are subject to FCC must-carry obligations" and if and when Channel 28 "does not fulfill [that obligation]," KBS America has "the right to terminate the Broadcasting License Agreement."

(7)     To assure the standing agreement between the parties, Mr. Kwon sent the

September 23, 2005 letter to Mrs. Bae.

(8)     To assure the standing agreement between the parties, Mr. Kwon sent the September 23, 2005 letter to Mrs. Bae.

(9)     At the May 10, 2006 meeting of KBS America's affiliates, Mr. Kwon said to their representatives that once they get on basic cable channels, no monthly fee will be required and as one of the most crucial goals of KBS America's goals, the affiliates should do everything possible to get this done.

85.     After having made the aforementioned representations for purposes of inducement, Mr. Kwon went back to the parent company in Korea. Accordingly, Plaintiffs have no opportunity to confront him concerning his promises and representations as stated above.

86.     Once Plaintiffs had made a great deal of investment for expanding KBS America' content and obtaining basic cable carriage through AT&T and Comcast, Mr. Eun, the second CEO of KBS America, represented that there was a change of company policy from Korea and implied that KBS America would not honor the standing agreement between the parties. After that, Mr. Eun went back to the parent company in Korea, KBS. Accordingly, Plaintiffs have no opportunity to confront him concerning the change of KBS's policy, if any.

87.     Mr. Choi, the third CEO of KBS America, completely changed Defendants' position concerning the standing agreement between the parties and unequivocally stated that she had no intent to be bound by any promises made by her predecessors.

88.     Plaintiffs committed one or more tortious acts in the furtherance of this scheme, including but not limited to making misrepresentations to Plaintiffs and contacting Comcast in an attempt to persuade Comcast to cease doing business with Plaintiffs and commence doing

business directly with KBS America.

89.     Defendants' participation in the scheme against Plaintiffs was knowing and voluntary.

**WHEREFORE**, Plaintiffs pray that this Honorable Court enter an injunction against Defendants ordering Defendants to cease any and all communication with Comcast in the greater Chicago, Illinois area and further relief as the Court may deem just and proper. Additionally, in the event Comcast terminates its broadcast agreement with Plaintiffs, Plaintiffs pray that this Honorable Court enter judgment against Defendants in an amount exceeding $75,000.00, costs of lawsuit herein, and for such other and further relief as the Court may deem just and proper.

Respectfully submitted,

Korean American Broadcasting Company, Inc., KM Communications, Inc., and KM LPTV of Chicago-28, LLC

/s/ W. Dan Lee

Attorney for Plaintiffs

W. Dan Lee (ARDC #6290032)
**LEE LAW OFFICES, LTD**
155 N. Michigan Ave, Suite 631
Chicago, IL 60601
(312) 729-5435 (tel)
(312) 729-5436 (fax)